# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

CAROLYN EVERETTE,

    Plaintiff,

    v.

LIBERTY LIFE ASSURANCE COMPANY
OF BOSTON and
GLAXOSMITHKLINE,

    Defendants.

Civil Action No. TDC-16-1248

## MEMORANDUM OPINION

After enduring chronic neck and back pain, Carolyn Everette, an administrative assistant at a pharmaceutical company, sought long-term disability benefits under the employee welfare benefit plan provided by her employer, GlaxoSmithKline, LLC ("GSK"), and administered by Liberty Life Assurance Company of Boston ("Liberty"). When Liberty denied her claim, she filed this action against Liberty and GSK under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461 (2012). Pending before the Court are Defendants' Motion for Summary Judgment and Everette's Cross Motion for Summary Judgment. For the reasons set forth below, Defendants' Motion is granted, and Everette's Cross Motion is denied.

## BACKGROUND[1]

Everette was employed by GSK as an administrative assistant, with duties which included scheduling telephone calls, meetings, and trips; preparing and reconciling expense reports; answering telephone calls; ordering and tracking office supplies; assisting new employees; preparing organization charts; planning events; and conducting research. In January 2014, Everette began to experience neck, shoulder, and lower back pain. Her treating physician, Dr. Alvin K. Antony, diagnosed her with cervical radiculitis and cervicalgia. According to Dr. Antony, as of July 2014, she had a "[m]oderate limitation of functional capacity" but was "capable of clerical/administrative activity." LL005781. She did not have any limitations caused by mental or nervous impairment.

On July 22, 2014, Everette filed a claim for long-term disability ("LTD") benefits under GSK's Group Disability Income Insurance Policy (the "Policy"). The Policy was issued by Liberty and governed by ERISA. Under the Policy, an employee has a disability when prevented by:

> Accidental bodily injury;
> Sickness;
> Mental Illness;
> Substance Abuse; or
> Pregnancy,
> from performing the Essential Duties of his Own Job, and as a result is earning less than 80% of his Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.

LL000009. If an employee is deemed to have a disability, Liberty "agrees to pay benefits provided by [the] policy in accordance with its provisions," LL000001, outlined in detail in the Policy's Schedule of Benefits.

---

[1]     Citations throughout this Memorandum Opinion that begin with "LL" are to the administrative claim file submitted by Liberty as an exhibit to its Motion for Summary Judgment, ECF No. 16.

2

Payment of monthly benefits is conditional upon the "Covered Person" giving to Liberty "Proof of continued Disability; Regular Attendance of a Physician; and Appropriate Available Treatment" as those terms are defined in the Policy. LL000027. In particular, the Policy defines "Proof" as "evidence in support of a claim for benefits and includes, but is not limited to, the following":

1. a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;
2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and
3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

LL000015. The Policy adds that "[p]roof must be submitted in a form or format satisfactory to Liberty." *Id.* It also outlines conditional dates upon which monthly LTD benefits will cease, which include:

1. the date the Covered Person fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician;
2. the date the Covered Person fails to cooperate in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.
                                    ***
6. the date the Covered Person is able to work in his Own Job on a part-time basis, but chooses not to;
                                    ***
8. the date the Covered Person is no longer Disabled according to this policy[.]

LL000040.

Under the Policy, Liberty has "the authority, in its sole discretion, to construe the terms of [the] policy and to determine benefit eligibility." LL000048. The Policy further states that Liberty's "decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." LL000048. Even when disability benefits are granted, Liberty

3

retains the right to have the employee "examined or evaluated at reasonable intervals deemed necessary by Liberty" to assess continuing disability. LL000047.

## I. Initial Determination

To assess Everette's claim, Liberty obtained medical records from Dr. Antony and another treating physician, Dr. Adam Thorp, as well as additional documentation from Everette. On August 29, 2014, Liberty requested an independent evaluation by a specialist in physical medicine and rehabilitation through MES Solutions, an outside vendor. The specialist, Dr. Arthur N. Hryhorowych, reviewed the medical records, spoke with Dr. Antony, and concluded that the evidence supported a diagnosis of chronic cervicalgia and lower back pain "secondary to degenerative disease, spondylosis and facet hypertrophy." LL005707. As of September 15, 2014, both he and Dr. Antony agreed that although Everette was limited to "sedentary work with the ability to change positions for comfort," she had "the capacity for full time work with the appropriate restrictions," such as restrictions on "carrying and lifting more than 10 pounds frequently." LL005705, LL005707.

That same month, on September 19, 2014, Everette informed Liberty that she would be undergoing neck surgery by Dr. Raymond Baule, a spine surgeon referred by Dr. Antony, on September 24. The surgery required a recovery period of at least six weeks, during which she would be unable to perform sustained work. Liberty therefore approved short-term disability benefits for Everette, up to October 14, 2014. In a September 25, 2014 letter, which served to update an earlier September 23, 2014 letter, Liberty informed Everette that her claim for LTD benefits had been approved, with benefits consisting of 70 percent of her pre-disability earnings, to begin on October 15, 2014. The letter also stated that she was required to apply for Social Security benefits if her disability was expected to last for 12 months or more. Liberty

4

communicated in its letter that it would continue to review her claim, request "medical documentation and updates to support your continued disability," and that, under the Policy, benefits would terminate upon, among other events, "the date the Covered Person fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician." LL000342.

## II. Denial of Benefits

After Everette's surgery, Liberty requested updated medical records from her doctors and an independent evaluation by a physical medicine and rehabilitation specialist. Conducting this evaluation, Dr. Hryhorowych reviewed the medical documentation obtained from Everette's treating physicians. These reports showed that an x-ray taken on September 16, 2014, before the surgery, revealed multiple degenerative disc disease, but no evidence of acute fractures or malalignment. Within one week of the surgery, on September 29, 2014, Everette visited Dr. Antony complaining of lower back pain, which worsened with activity, and neck pain that was "causing significant disability." LL000630-LL000631. At the same time, Dr. Antony noted that Everette had completed surgery and "[r]eported she is doing well." *Id.* During a visit on October 28, 2014, Dr. Antony noted that Everette continued to complain of lower back pain affecting her thigh and foot and neck pain affecting her arm, that activity and physical therapy worsened her pain, and that he planned to give her epidural injections.

Everette also visited with Dr. Baule after her surgery. On October 9, 2014, Dr. Baule noted that post-surgery, her "symptoms are much improved compared to preoperative." LL000632. In a December 31, 2014 report, however, Dr. Baule stated that Everette continued to complain of lower back pain radiating to her lower left leg, that it was exacerbated by standing and walking, and that the epidural injections had not helped. Nevertheless, he noted that her

5

"cervical symptoms are improved compared to pre-op" and her mental status, motor skills, and gait all appeared to be normal. LL005510-LL005511.

In a January 21, 2015 report, Dr. Hryhorowych concluded that the records supported diagnoses of, among other things, "cervicalgia and [lower back pain] with radicular symptoms," which were the cause of her impairment. LL005495. Although Everette had been diagnosed with depression, he found that Everette had "no neurological deficits" according to the information submitted and that there was "no evidence of any side effects from prescribed medication in the medical records reviewed." *Id.* He thus concluded that Everette "should be able to perform full time work" under the following conditions:

- Based on her neck and lower back pain, she should be restricted from lifting, pushing, and pulling items and carrying more than 10 pounds frequently or 20 pounds occasionally.
- She should not sit for more than 30 minutes at any one time, and even with the ability to change position for comfort, she should not sit for more than a total of 6 hours in an 8 hour day.
- She should not stand for more than 1 hour at any time, and even with the ability to rest for 5 minutes every hour, she should not stand for more than a total of 2 hours in an 8 hour day.
- She should not walk for more than 1 hour at any one time, and even with the ability to rest for 5 minutes every hour, she should not walk for more than a total of 2 hours in an 8 hour day.
- She should be restricted from squatting, kneeling, or climbing ladders.

LL005496. He did not recommend any restrictions on typing, keyboard work, or repetitive use of her hands or operating machinery. Although Dr. Hryhorowych reached his conclusions based on documentary evidence only, he had unsuccessfully attempted to speak to Dr. Antony and Dr. Baule on multiple occasions.

In a letter dated January 29, 2015, Liberty informed Everette that her LTD benefits were "not payable beyond January 26, 2015" because the restrictions and limitations suggested by Dr. Hryhorowych "would not preclude you from performing the material and substantial duties of

your sedentary job as an administrator." LL005489-LL005490. This conclusion was based on a comparison of the identified restrictions to a position description submitted by GSK, which stated that the administrative assistant position is a "sedentary" position which had physical requirements including "5-6 hours sitting" per day and "lifting 10 lbs max and occasionally lift[ing] and carry[ing] items." LL000477. The letter included details about how to request a review of the denial of benefits.

On February 20, 2015, Everette submitted a letter appealing Liberty's decision. She explained that she was continuing to suffer pain following the surgery that radiates through her arms to her fingers and down her left leg to her foot and that her medication was causing various side effects, including dizziness. Everette stated that the frequent flare-ups of pain and side effects made concentrating and staying on task difficult. She noted that she depends on her family for assistance with daily activities and does not leave the house without help. Everette included a copy of an undated short-term disability benefit statement, completed by Dr. Baule in late September or early October 2014, noting that she was not able to return to work. Everette also enclosed documentation of her successful October 2014 application to the United States Department of Education ("DOE") to discharge her federal educational loan due to total and permanent disability, which included a physician's certification in which Dr. Baule stated that she was "unable to engage in any substantial gainful activity in any field of work" and that the disability had lasted, or was expected to last, at least 60 months. Although Liberty asked Everette if additional medical records would be submitted, and Everette informed Liberty that she would send additional documentation relating to visits to Dr. Antony, Dr. Baule, and a chiropractor in 2015, Everette did not submit any additional materials.

In a March 20, 2015 letter, Liberty denied Everette's appeal. After summarizing the relevant medical documentation and the details conveyed by Everette in her appeal letter, Liberty stated:

> [W]e do understand that you continue to experience symptoms beyond January 27, 2015; however, the available information does not contain physical exam findings, test results or other forms of objective medical evidence substantiating that your symptoms remained of such severity that they resulted in restrictions and limitations rendering you unable to perform your own job beyond January 27, 2015.

LL005468-LL005471.

Following the denial, Everette retained counsel, who requested various documents, including the claim file and any additional information later added to her file. Everette's counsel then submitted additional documentation to Liberty for review on appeal. These materials included statements by Everette and two of her co-workers asserting that she had "Supplemental Job Requirements" such as preparing presentation materials, coordinating meetings, making travel arrangements, and assisting with facilities management requests relating to furniture and equipment issues, and that these duties required her to stand or walk for 90 percent of the day and lift or carry up to 30 pounds on an occasional basis. The submitted materials also included letters, written in March and April 2015, from Everette's family members and close friends attesting to her continuing back pain and describing how it has made her appear depressed and has severely impaired her daily activities, including causing her to require assistance with household tasks, stop driving, have others attend to her son, and miss important family events.

Everette also submitted documentation of an evaluation of her fitness to work, including an April 8, 2015 Functional Capacities Evaluation ("FCE") by Shondell Jones, a physical therapist, and a July 15, 2015 "Medical and Functional Capacity Assessment" by Tasha Harris, a certified physician's assistant. After conducting an evaluation of Everette's ability to carry out

8

particular tasks relating to the workplace, Jones concluded that Everette cannot lift, carry, push, or pull items and should avoid bending, squatting, or reaching above her shoulder. Jones did find that Everette could frequently use fine motor skills, could occasionally pinch or grasp objects, and could occasionally reach forward and walk at a fast pace. She found that Everette had the ability to spend a total of 5 hours and 6 minutes sitting (1 hour and 14 minutes at one time) and 2 hours standing (26 minutes at one time), but concluded, based on observation and Everette's "self-report," that she can sit for only 3 hours and 30 minutes during a work day and can stand for only two hours total per day. Based on all of her testing, Jones concluded that Everette "was unable to safely perform at a sedentary level for an 8 hour day based on the inability to stand/walk, sit, carry items, elevate her arms and turn her back and neck during the FCE." LL000822.

In her report, Harris determined that "based on an assessment done by Physical Therapy," Everette could not lift more than 20 pounds, climb, kneel, crouch, stoop, or push and pull a heavy door. LL000198-LL000200. She found that Everette could only sit for three hours total and stand or walk for less than one hour total during the course of an eight-hour workday. Everette would require over three hours of rest per day due to pain, in 15 minute increments. Accordingly, Harris concluded that Everette would not be able "to alternate between sitting and standing on a continuous basis throughout an eight hour workday with customary breaks without experiencing interruption due to pain" and thus could not sustain a full-time work schedule. LL000197, LL000201.

Finally, Everette submitted a June 15, 2015 neuropsychological evaluation by Dr. Jerry Brittain, who had administered several neuropsychological tests and diagnosed Everette with severe major depressive disorder and an unspecified intellectual disability. He opined that "the

9

current and significant clinical depression is secondary to the physical illness" and "is aggravating the underlying medical conditions." LL005263.

Liberty retained another independent physical medicine and rehabilitation specialist to review the documentation submitted in support of Everette's appeal. Dr. Philippe Chemaly, board certified in physical medicine and rehabilitation with a subspecialty in pain management, concluded "within a reasonable degree of clinical probability" that Everette was functionally impaired because of neck and low back pain. LL000164-LL000165, LL000167. His evaluation summarized the medical records received and noted unsuccessful attempts to contact treating physicians Dr. Antony and Dr. Baule. Dr. Chemaly concluded that Everette could work an eight-hour day with the following restrictions and limitations:

- Everette should be allowed a symptom-relieving break from sitting every hour for 5-10 minutes and should not sit more than 6 hours in an 8-hour day.
- She should be allowed a symptom-relieving position break from standing and walking every half hour for 5-10 minutes, and she should not stand or walk for more than 2 hours in an 8-hour day.
- She should only occasionally squat, bend, or reach below the waist or above the shoulder.
- Lifting and carrying and pushing or pulling would be limited to 20 pounds on an occasional basis,
- She should not work at unprotected heights or climb ladders.

*Id.* He did not recommend restrictions on reaching between her waist and shoulder or on engaging in fine motor activities such as gripping, grasping, and typing.

In so finding, Dr. Chemaly generally rejected the FCE findings submitted by Everette, concluding that "the medical records reflect greater functionality than" what was reported during the FCE. LL000174. According to Dr. Chemaly, the FCE evaluation "was significantly compromised based on lack of documentation of effort" because Everette's heart rate following certain FCE tests was 73 beats per minute, which was lower than her resting heart rate of 80

beats per minute. *Id.* Dr. Chemaly also based his conclusion on his finding that the medical records did not support either neurological deficits or "cognitively impairing side effects of prescribed medications." LL000172, LL000174.

Liberty also asked Dr. John Crouch, a clinical neuropsychologist, to review Dr. Brittain's neuropsychological evaluation along with the available medical documentation. Dr. Crouch concluded that Dr. Brittain's evaluation did not support any "occupational restrictions or limitations" because "findings from [the] assessment can neither be considered valid/reliable nor adequate to support the presence of functional impairment or associated" restrictions and limitations. LL000153. Dr. Crouch also added that his own review of Everette's medical records otherwise "provides little, if any, evidence of psychiatric complaints or observed psychiatric symptoms," and that depression had been noted as "a contributing, not primary, contributor to her difficulties." LL000154. Ultimately, he opined that "insufficient information is provided to support valid/reliable neurocognitive or psychiatric impairment." LL000155.

In a letter dated September 11, 2015, Liberty informed Everette's counsel that it was upholding its original determination that Everette would not receive LTD benefits beyond January 27, 2015. Liberty noted that based on Everette's contention that her job actually required her to stand and walk 90 percent of the time and lift up to 30 pounds on an occasional basis, it had sought clarification from GSK. GSK confirmed that Everette's administrative assistant position consists of sitting 5-8 hours per day and standing or walking only 0-3 hours per day, and that her position does not require lifting 30 pounds or repeated lifting of items over 11 pounds. It therefore had no reason to revise its assessment based on Everette's claims of more physically demanding duties. Liberty thus stated that "[h]aving carefully considered all of the information submitted in support of Ms. Everette's claim, our position remains that proof of her

continued disability in accordance with the Policy provisions after January 27, 2015 has not been provided." LL000144.

## DISCUSSION

Defendants seek summary judgment in their favor, arguing that Liberty's decision to deny Everette's LTD claim was reasonable because it was based on a careful consideration of the record and was supported by substantial evidence. Everette seeks summary judgment in her favor, contending that Liberty's decision to terminate Everette's disability benefits was unreasonable because Liberty made its decision based on a paper review, without requesting an independent medical and psychological examination; Liberty selectively reviewed the medical evidence and did not fairly consider Everette's proffered evidence; Liberty failed to consider the combination of Everette's ailments, including her chronic pain and her psychological issues; and Liberty's denial was inconsistent with its suggestion that Everette apply for Social Security benefits. Everette also seeks summary judgment on her claim that she is entitled to recover statutory penalties under ERISA based on Liberty's failure to produce claim notes to her upon request.

## I.     Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248-49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

In reviewing a plan administrator's denial of benefits under 29 U.S.C. § 1132(a)(1)(B), a district court is to apply a *de novo* standard, unless the benefit plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the benefit plan provides discretionary decisionmaking authority to the administrator, a district court's review is governed by an abuse of discretion standard, under which the administrator's decisions will not be disturbed, even if the court "would have come to a different conclusion independently," if it "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997) (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Because the Policy provides

such discretionary authority to the administrator, the abuse of discretion standard applies to this case.

Notably, if "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (alteration in original) (quoting Restatement (Second) of Trusts § 187 cmt. d (Am. Law. Inst. 1959)); *accord Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117-19 (2008). In this case, Liberty has a conflict of interest because it is both the insurer and the decisionmaker with respect to any claims for benefits under the Policy. *See* LL000001, LL000048. The United States Court of Appeals for the Fourth Circuit has stated that reviewing a decision by such an administrator requires considering the administrator's "motives and any conflict of interest it may have," in addition to other nonexclusive factors: (1) the language of the plan; (2) the purpose and goals of the plan; (3) the adequacy of the materials considered; (4) whether the administrator's interpretation was consistent with other provisions and earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; and (7) any external standard relevant to the exercise of discretion. *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010).

## II.     Denial of Benefits

Liberty contends that its denial of Everette's benefits was the product of a "deliberate, principled reasoning process" and was "supported by substantial evidence." *Ellis*, 126 F.3d at 232 (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)). Everette argues that Liberty's termination of her LTD benefits constitutes an abuse of discretion given the conflicts of

interest present, the decision to utilize only a paper review, and the selective review of the medical record.

## A. Decisionmaking Process

Upon review of the record, the Court concludes that Liberty followed a reasoned, deliberate procedure for reviewing pertinent information throughout the claim determination process. In the revised September 25, 2014 letter approving Everette's LTD benefits claim following her September 24, 2014 surgery, Liberty stated that it would continue to review the claim and specifically referenced the Policy provision stating that benefits would cease on "the date the Covered Person fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician." LL000342; *see* LL000065. After the surgery, Liberty requested updated documentation from Everette's medical providers. Liberty also engaged an independent physician, Dr. Hryhorowych, to review Everette's medical records and contact Everette's treating physicians to discuss her functional capabilities. Everette's treating physicians, Dr. Antony and Dr. Baule, did not return the calls of Dr. Hryhorowych or provide written opinions as to whether Everette was able to work at GSK. With her doctors declining to provide input, it was appropriate for Liberty to rely on Dr. Hryhorowych's review of the medical records to assess her disability status and conclude that Everette had not provided sufficient proof of continued long-term disability.

Liberty's consideration of Everette's appeals was a "fair and searching process." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 323, 326 (4th Cir. 2008). When it first denied Everette's claim for LTD benefits in its January 29, 2015 letter, Liberty informed Everette how to appeal the decision. In response to Everette's February 20, 2015 correspondence, which enclosed the short-term disability statement and the DOE certification

form completed by Dr. Baule, Liberty contacted Everette to ask whether she would be submitting any additional medical records for review. When Everette told Liberty that she would send records from visits with three doctors in January 2015, the plan administrator both encouraged her to submit the documentation as soon as possible and followed up with a letter reminding her to do so by March 18, 2015. Liberty waited until that deadline passed to complete the appeal review, which considered the materials submitted by Everette, and promptly informed her on March 20, 2015 of its decision to uphold the termination of benefits based in part on the fact that "no additional medical information was submitted." LL000358.

Although the resolution of Everette's first appeal exhausted her administrative right to review, Liberty nevertheless considered and evaluated Everette's second appeal, initiated with the assistance of counsel. After receiving the new documents, Liberty took affirmative steps to evaluate the evidence submitted in Everette's favor, including by contacting GSK to seek additional information with which to evaluate Everette's supplemental job description, by engaging Dr. Crouch, a consulting neuropsychologist, to evaluate the report of Dr. Brittain, and by retaining Dr. Chemaly, an independent physical medicine and rehabilitation specialist, to evaluate all of the submitted materials. Only after seeking review by more than one specialist and considering all of the documentation submitted did Liberty issue a final denial of Everette's claim. The Court therefore finds that Liberty engaged in a reasoned, deliberate process in reviewing whether Everette had a continuing disability.

### B. Proof of Continuing Disability

In assessing whether Liberty abused its discretion in denying Everette's LTD benefits, the Court must first consider whether Everette has satisfied her "initial burden of submitting proof that she could not perform" her job. *Stup v. Unum Life Ins. Co.*, 390 F.3d 301, 308 (4th

Cir. 2004). If such proof was provided, the Court also considers whether there was "substantial evidence" that she could perform such work. "Substantial evidence" is defined as "the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that 'a reasoning mind would accept as sufficient to support a particular conclusion.'" *Donnell v. Metro. Life Ins. Co.*, 165 F. App'x 288, 295 (4th Cir. 2006) (quoting *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984), *abrogated on other grounds by Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003)).

### 1. Medical Opinions

Under the Policy, Everette was required to provide "proof of her continued disability" after January 27, 2015 in order to continue to receive LTD benefits. LL000144. The Policy's definition of "proof" specifically identifies only three non-exclusive items: a claim form, "an attending Physician's statement," and "objective medical evidence" including "standard diagnosis, chart notes, lab findings, test results, [and] x-rays." LL000015. Everette and her physicians provided her medical records, and it is uncontested that the records establish that she has been diagnosed with cervicalgia and lower back pain, continued to have neck and back pain, and eventually underwent another surgery in May 2015. Among other reports, Everette submitted post-surgery medical records documenting that she continued to experience lower back pain at her October 28, 2014 visit to Dr. Antony and that as of the December 31, 2014 visit to Dr. Baule, epidural injections were not alleviating her pain. Similarly, Dr. Baule stated in a report relating to an April 16, 2015 visit that Everette was continuing to experience lower back pain and that "[s]he has had conservative treatment including injections with unsatisfactory relief," and Dr. Antony observed in a May 11, 2015 visit that Everette's lower back pain had become "more prominent." LL000711, LL000775. However, Everette did not provide an

17

Attending Physician's Statement establishing that her neck and back pain precluded her from working as an administrative assistant after January 27, 2015. Indeed, although a medical opinion typically forms the core of the proof of continuing disability, Everette has submitted only cursory, conflicting, and outdated statements of her treating physicians' views on her ability to work.

Everette's primary treating physician was Dr. Antony. In July 2014, Everette provided, with her LTD claim form, an Attending Physician's Statement signed by Dr. Antony in which he stated that Everette had "[m]oderate limitation of functional capacity" and was "capable of clerical/administrative activity." LL005782. According to the September 15, 2014 report of Dr. Hryhorowych, as part of his initial review of Everette's case, he spoke to Dr. Antony, who "agreed that the patient does have the capacity for full time work with appropriate restrictions." LL000506. This statement has never been rebutted or refuted. Although Dr. Antony continued to treat Everette after her surgery on September 24, 2014 through at least May 11, 2015, he has never altered these opinions, which support the conclusion that Everette could continue to work, and he has never offered a medical opinion that she is disabled and cannot work on a full-time basis or otherwise.

Around the time of the surgery, Everette's surgeon, Dr. Baule, completed a Short Term Disability Benefit Statement, submitted to GSK, in which he checked a box stating Everette "is not able to return to work" and noted that she could sit for only one to two hours in a workday and could not lift more than five pounds, but left blank the space in which to indicate her estimated return to work date. LL000321. On October 14, 2014, less than three weeks after Everette's surgery, Dr. Baule completed a physician's certification form in support of Everette's request to have her student loan discharged by DOE in which he checked a box stating that

18

Everette was "unable to engage in any substantial gainful activity in any field of work," and that this condition had lasted or was expected to last for a continuous period of 60 months. LL000321. However, when Everette visited Dr. Baule on December 18, 2014, he noted that although she continued to report radiating pain, "[h]er cervical symptoms are improved compared to pre-op." LL005510. Despite the evolving nature of her condition, Dr. Baule did not provide an updated opinion during the ensuing months before Liberty's final determination in September 2015 that Everette was not eligible for LTD benefits. Furthermore, he never provided an opinion to Liberty on the specific issue of whether Everette could carry out her duties as an administrative assistant at GSK on a full-time basis.

Liberty reasonably concluded that the Short Term Disability Benefit Statement addressed Everette's condition at the time of the surgery and did not speak to her longer term condition as of January 2015. The certification submitted to DOE was similarly prepared at an earlier time, based on Everette's condition shortly after the surgery, and before improvements in her condition had been acknowledged. Given that it was prepared for a different purpose under a different standard for disability, Liberty reasonably could decide not to rely upon it. *See Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 275 (4th Cir. 2002) (holding that the plan administrator was not obligated to give substantial weight to the Social Security Administrator's determination that the plaintiff was disabled where the applicable disability standard based on "substantial gainful activity" differed from the Policy's definition of disability); *cf. Smith v. Continental Cas. Co.*, 369 F.3d 412, 420 (4th Cir. 2004) (holding that the district court erred "by equating the determination of disability under the Social Security regime with the determination of disability under the ERISA plan at issue" because "what qualifies as a disability for social security disability purposes does not necessarily qualify as a disability for purposes of an ERISA

benefit plan"). Thus, it was reasonable for Liberty to ask Everette to submit additional medical documentation as part of her appeal, and for Liberty's independent doctors specifically to reach out to Everette's treating physicians for more information. Despite these inquiries, neither doctor responded or provided any further opinions.

The fact that such requests went unheeded, and that no medical opinion specifically attesting to Everette's inability to perform her job was submitted, is highly significant. Everette's counsel has explained this omission by asserting that physicians generally are not well-positioned to assess whether a patient can work because they lack familiarity with the relevant job duties. However, a review of case law reveals that treating physicians routinely provide specific medical opinions on whether patients can carry out their job functions, and to the extent that the Fourth Circuit finds that an employee has provided sufficient proof of disability such that a plan administrator abused its discretion in denying disability benefits, it typically relies specifically on a detailed opinion from a physician attesting to the employee's inability to carry out the duties of the job.

For example, in *Stup*, the Fourth Circuit found that the claimant had met her burden of showing her disability based in significant part on a "detailed opinion" from her treating physician that the claimant's fibromyalgia caused "short-term memory deficiency" and "severe, persistent fatigue" that prevented her from "being able to perform normal daily activities," and that her degenerative disc disease "caused limited mobility and pain in both her hands" such that she is not "physically capable of performing even sedentary work" and is "totally disabled from all work." 390 F.3d at 308.

Likewise, in *Williams*, the court relied on an opinion from a treating physician stating that the claimant was "significantly disabled" and that it was "impossible" for her "to do any kind of

repetitive work with the right hand," and a second opinion from a different treating physician stating that the claimant "no longer can deal with computers because of her hand pain" and thus "is totally disabled from her prior occupation," in concluding that the plan administrator had abused its discretion in denying benefits. 609 F.3d at 628, 633-34. In another case, the court found that a truck driver with degenerative disc disease had "provided sufficient proof of his continued disability" based in part on a detailed opinion from a physician who conducted an independent medical examination and concluded that the claimant was "totally disabled from returning to long distance truck driving" because his job required "forceful pushing and pulling" and he "could not maintain the continuous mental concentrations" required for the job, such that "he would be a dangerous hazard to traffic in addition to aggravating his physical condition." *Whitley v. Hartford Life & Accident Ins. Co.*, 262 F. App'x 546, 555 & n.8 (4th Cir. 2008).

Here, where Everette has not provided such a medical opinion from a treating physician attesting to her inability to do her job, it was not unreasonable for Liberty to conclude that it lacked sufficient medical proof of continuing disability. Everette's submission of an opinion from a physician's assistant, Tasha Harris, apparently in lieu of a doctor's opinion, serves only to highlight this glaring omission. Not only does Harris offer none of the detail of the opinions typically relied upon to find proof of continuing disability, but her opinion primarily consists of checking boxes on a form apparently submitted to her by Everette's attorney, including one stating that Everette cannot work an eight-hour day on a sustained basis. It is unclear from the form whether Harris actually examined Everette. Although the checked boxes signify that Everette has limitations on her physical ability to sit and stand for periods of time and to carry out certain physical tasks, Harris notes that "these are based on an assessment done by Physical Therapy," indicating that she may have been simply reporting information from a functional

capacity evaluation conducted by a physical therapist rather than her own independent evaluation. LL000200; *see infra* Part II.B.2. Most importantly, Harris, who lists her specialties as family medicine and gynecology, notes that Everette is "managed by a specialist," that the specialist's "thoughts would be helpful," and acknowledges that certain questions on the form "need to be answered by her specialist." LL000196, LL000202. It is therefore entirely reasonable that Liberty did not accept this report as the equivalent of an Attending Physician's Statement and rely upon it as acceptable proof of continuing disability.

Likewise, the June 15, 2015 neuropsychological evaluation by Dr. Brittain did not serve as medical proof of continuing disability. Although Dr. Brittain diagnosed Everette with severe major depressive disorder and an unspecified intellectual disability, and opined that Everette had low verbal and visual spatial memory and low verbal fluency, these issues were not directly related to the purported basis for long-term disability, Everette's neck and back pain. More importantly, Dr. Brittain did not opine that these conditions, alone or in combination with Everette's neck and back conditions, prevented Everette from full-time work in her administrative assistant position. As noted by Dr. Crouch, the clinical neuropsychologist engaged by Liberty to review Dr. Brittain's evaluation, Dr. Brittain's findings do not purport to justify any "occupational restrictions or limitations." LL000153. Liberty thus appropriately gave little weight to this opinion.

Under these circumstances, it was reasonable for Liberty to engage the two independent, board-certified physicians, Dr. Hryhorowych and Dr. Chemaly, to review Everette's medical records to determine if they established continuing disability, and to rely on their conclusions. Both physicians found that the records did not show that Everette was unable to perform full-time work and instead concluded that she was capable of work with certain restrictions. In his

January 21, 2015 report, Dr. Hryhorowych, who is board certified in physical medicine and rehabilitation, reviewed the available medical records and noted that, although Everette was diagnosed with cervicalgia and lower back pain and continued to have pain radiating into her thigh, her symptoms were "much improved compared to her preoperative status," and she had normal strength and a normal gait. LL000501. Dr. Hryhorowych concluded that subject to certain restrictions, including that Everette cannot squat, kneel, or climb ladders and must be permitted to change positions every 30 minutes while sitting, she "should be able to perform full time work" consisting of an eight-hour day with six hours of sitting. LL000502. He also concluded that Everette did not need any restrictions on typing, keyboard work, and repetitive use of her hands. Dr. Hryhorowych also specifically noted the lack of any documentation of side effects from Everette's medicine or any neurological deficits.

Dr. Chemaly, board certified in physical medicine and rehabilitation, similarly concluded in his August 6, 2015 report that post-surgery, Everette had cervical degenerative disc disease and was functionally impaired because of neck and lower back pain, but noted that she walked without any assistive device. He concluded that she could work an eight-hour day, including six hours of sitting, with certain restrictions and limitations such as a position break every hour and a bar on lifting, carrying, pushing, or pulling 20 pounds or more. He would impose no restrictions on reaching between her waist and shoulder or engaging in fine motor activities such as gripping, grasping, and typing. He also found no evidence in the medical records of any neurological deficits or that any medication was causing cognitive impairment. Although both doctors reached their conclusions based on documentary evidence only, each had unsuccessfully attempted to speak to Dr. Antony and Dr. Baule on multiple occasions. Dr. Hryhorowych and Dr. Chemaly did not provide detailed analysis of the medical evidence, but in the absence of

competing views from the treating physicians, or any other physicians offered by Everette, Liberty could reasonably rely on their conclusions that the medical records did not provide proof of continuing disability, and that Everette could work subject to certain restrictions.

Everette asserts that the Court should not credit the opinions of Dr. Hryhorowych and Dr. Chemaly because they are inherently biased by virtue of their role, and that Liberty's analysis was flawed because it did not include an independent physical or psychological examination of Everette. First, Liberty's retention of independent physicians to review the medical records and assess Everette's ability to work helps to mitigate its "potential conflict of interest as administrator and insurer," because the independent physician is "presumably free of defendant's conflict of interest." *DiCamillo v. Liberty Life Assur. Co.*, 287 F. Supp. 2d 616, 624 (D. Md. 2003). Although Everette argues that independent medical examiners are nevertheless biased because they are regularly retained and paid by plan administrators, she does not provide any evidence that Dr. Hryhorowych or Dr. Chemaly was biased in this case. Generalized allegations of bias are not a sufficient basis to find a plan administrator's decision to be an abuse of discretion. *See Donnell*, 165 F. App'x at 295 n.7 (rejecting the claim that an independent medical examiner "was biased due to his affiliation with a firm that markets its medical review services to disability insurers" where the plaintiff "pointed to no evidence suggesting that this affiliation unduly influenced" the review of the evidence); *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005) (declining to hold that the plan administrator acted arbitrarily based on the argument that the independent examiner operated under a conflict of interest where the plaintiff "offered only conclusory allegations of bias with regard to" the reviewer).

Likewise, "independent examinations of claimants are not required" even where the policy allows for them. *Laser v. Provident Life & Acc. Ins. Co.*, 211 F. Supp. 2d 645, 650 (D. Md. 2002); *see also Kalish*, 419 F.3d at 508 ("[R]eliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly." (first alteration added) (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005))). Although "[w]hether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician," *Kalish*, 419 F.3d at 508, here Everette did not offer a conflicting medical opinion from her treating physician attesting to her present inability do her job at GSK, such that an additional medical examination would have been warranted. In the absence of such an opinion, and where Liberty's requests for additional views from Everette's treating physicians were not answered, Liberty did not abuse its discretion by relying on the medical opinions of independent physicians who reviewed Everette's medical records and the other submitted materials. *See, e.g., Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 344 (4th Cir. 2000) (upholding a benefits determination where the administrator commissioned "reviews by independent doctors" and "considered all the records and letters" submitted by the plaintiff and her treating physicians).

### 2. Additional Evidence

Beyond the medical records, Everette submitted a functional capacity evaluation conducted by physical therapist Shondell Jones on April 8, 2015. The FCE concluded that Everette "was unable to safely perform at a sedentary level for an 8 hour work day" and that "she would be extremely challenged" to work on a full-time basis. LL000822. Although the FCE provides some objective evidence in support of Everette's continuing disability, Dr. Chemaly

reviewed it at Liberty's request and concluded that it was "significantly compromised based on lack of documentation of effort." LL000172, LL000174. Specifically, he noted that Everette's heart rate following certain FCE tests relating to standing, sitting, and typing was 73 beats per minute, which was lower than her resting heart rate of 80 beats per minute, indicating that she had not properly exerted herself during those tests. Dr. Chemaly concluded that "the medical records reflect greater functionality than" what was reported during the FCE. LL000174.

Dr. Chemaly's analysis of the FCE was limited. He failed to note that elsewhere in the FCE, including in the tests on walking and reaching, Everette's heart rate had increased. At the same time, the FCE was problematic in other ways. The FCE acknowledged that the testing revealed that Everette had been able to sit for "5 hours and 6 minutes" in a day, but concluded that her maximum sitting per day was "3 hours and 30 minutes," based in part on Everette's "self-report." LL000826, LL000829. The FCE also acknowledged that Everette had given "unreliable pain reports" on several tests. LL000826-27, LL000829. A determination that a FCE is flawed in some respect has been considered by courts as a factor in determining whether there has been an abuse of discretion. *See White v. Eaton Corp. Short Term Disability Plan*, 308 F. App'x 713, 717-19 (4th Cir. 2009) (describing the plan administrator's "failure to account for the internal inconsistencies in the FCE" as "especially problematic"); *Donovan v. Eaton Corp., Long Term Disability Plan*, 462 F.3d 321, 328-29 (4th Cir. 2006) (relying on the treating physician's critique of an FCE in finding that the plan administrator abused its discretion in denying benefits); *Toothman v. Bob Evans Farms, Inc.*, No. 2:08–1037, 2009 WL 4927866, at *11 (S.D.W. Va. Jan. 21, 2009) (stating that a vocational rehabilitation specialist's criticisms of an FCE were "properly considered" by the plan administrator and that "it was not unreasonable . . . to rely" on those concerns in concluding that the claimant had not met her burden to

demonstrate disability). Notably, unlike in *Donovan*, where the claimant's treating physician offered an analysis of an FCE, the only other evaluation of Everette's FCE was offered by Harris, the physician's assistant, who endorsed the findings of the FCE without analysis and listed Everette's capabilities to stand, sit, and function at work as "based on an assessment done by Physical Therapy." LL000200. Placed alongside Dr. Chemaly's assessment of the FCE as flawed, it was not unreasonable for Liberty to discount Harris's rubber-stamping of the FCE, where Dr. Chemaly is board-certified in physical medicine and rehabilitation, and Harris is a physician's assistant who lists her areas of expertise as family medicine and gynecology. *Cf. Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("[T]he assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, . . . a specialist engaged by the plan has expertise the treating physician lacks."); *Martin v. Hartford Life & Acc. Ins. Co.*, No. WDQ-12-2134, 2013 WL 5297146, at *5 (D. Md. Sept. 18, 2013) (stating that the defendant "reasonably credited" the opinion of a board certified physician with expertise in ear disorders over the diagnosis of a nurse even where the doctor did not treat the claimant). Thus, despite the limited nature of the concerns raised by Dr. Chemaly, where there is at least reason to question the FCE, it was not unreasonable for Liberty to conclude that the FCE did not provide sufficient proof of continuing disability, particularly in the absence of a physician's opinion that Everette's condition prevented her from doing her job.

The remaining information submitted by Everette does not alter this conclusion. Everette submitted a letter stating, among other things, that since her September 2014 surgery, she continued to have radiating pain down her arms and legs, "stabbing, shooting" pain in her back, and difficulty with lifting, bending, reaching, pulling, sitting, walking, and prolonged standing.

LL000318.  She also reported lightheadedness from pain medication and difficulty concentrating and staying on task.  Everette's family and friends submitted letters stating that they noticed her physical and mental condition decline, that she does not leave the home often, that she has family members handle household chores for her and drive her son to school, and that she has missed important family events because of her back pain.  Such subjective views from individuals without a medical background are afforded less weight than objective medical evidence.  *See Hensley v. Int'l Bus. Machs. Corp.*, 123 F. App'x 534, 539-40 (4th Cir. 2004) ("[T]he Fourth Circuit has held that denials of benefits are permissible where the claimant provides only subjective pain complaints and not objective evidence."); *Larson v. Old Dominion Freight Line, Inc.*, 481 F. Supp. 2d 451, 459 (M.D.N.C. 2007) ("[T]he administrator and the Court should consider the degree to which subjective complaints are supported by objective evidence of disability and the degree to which other evidence refutes such claims."), *aff'd*, 277 F. App'x 318 (4th Cir. 2008).  Courts regularly conclude that such submissions "do not compensate for the fact that there is insufficient evidence of functional disability in the record." *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1136 (C.D. Cal. 2015) (noting that observations of family and friends do not relate to the employee's condition in the workplace and "present a significant potential for bias"); *see Brigham v. Sun Life of Canada*, 183 F. Supp. 2d 427, 438 (D. Mass. 2002) (finding that affidavits of family and friends attesting to the claimant's inability to perform routine tasks and need for assistance with daily living did not render the denial of benefits unreasonable).  Here, it was reasonable for Liberty to conclude that the subjective submissions by Everette and her family and friends do not change its assessment that there was "insufficient medical evidence" to establish her continuing disability as of January 27, 2015.  LL000358.

Finally, Liberty's decision to reject Everette's supplemental job description was reasonable. On her second appeal, Everette submitted her own statement and those of two co-workers asserting that her administrative assistant position at GSK actually required standing or walking for roughly 90 percent of the workday and sitting for only 10 percent of the workday, as well as lifting and carrying up to 30 pounds "on an occasional basis," that is, for "up to one third of the workday." LL005248. Liberty, however, sought clarification from GSK, which reaffirmed that Everette's administrative assistant position involved standing or walking only 0-3 hours per day and sitting 5-8 hours per day, and that it did not require either repeated lifting of "items over 11 pounds" or any lifting of items of 30 pounds, as "an essential function" of the job. LL000181-LL000183. It was reasonable for Liberty to rely on GSK's initial statement of the physical requirements of the job as "lifting 10 lbs max" and "mostly 5-6 hours sitting." LL005686. The Court therefore finds no abuse of discretion in Liberty's determination that Everette had not provided sufficient proof of continuing disability.

## C.     Abuse of Discretion

Where Liberty reasonably found a lack of proof of continuing disability, it acted reasonably in denying Everette's continuing LTD benefits on that basis alone. *See Stup*, 390 F.3d at 308 (referring to the claimant's "initial burden of submitting proof" before considering whether the plan administrator had "substantial evidence"). Moreover, under the circumstances, Liberty did not abuse its discretion in relying on the opinions of Dr. Hryhorowych and Dr. Chemaly, who stated that the medical records did not show that Everette was unable to continue to work with certain restrictions, as substantial evidence sufficient to support the denial of LTD benefits. Courts have relied on the opinions of independent physicians who have reviewed medical records without examining the claimant when, as here, there was no competing

physician's opinion attesting to the claimant's disability, but only opinions from non-physicians. *See, e.g.*, *DiCamillo*, 287 F. Supp. 2d at 624 (finding no abuse of discretion in denying benefits based on the medical record evaluations of independent physicians where with "the exception of a report from his physical therapist, no further medical records from DiCamillo's treating physicians suggest that DiCamillo was totally disabled and unable to perform the duties of his job"); *Martin*, 2013 WL 5297146 at *6 (upholding the denial of disability benefits based in part on paper reviews by consulting physicians, where the only contrary opinion came from a nurse). Courts that have found an abuse of discretion based on the alleged inadequacy of opinions by independent medical reviewers have done so because such opinions did not provide a basis to refute a detailed medical opinion by an examining physician. *See, e.g.*, *Stup*, 390 F.3d at 308, 310-11; *Williams*, 609 F.3dd at 633-34; *Donovan*, 462 F.3d 328-29; *Whitley*, 262 F. App'x at 554-55. No such opinion exists here.

Everette also argues that Liberty improperly engaged in a partial, selective review of the record and did not give sufficient weight to evidence supporting Everette's claim. The United States Supreme Court has held that a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan*, 538 U.S. at 834. However, when presented with evidence that recommends differing results, it is the plan administrator's role "to resolve the conflicts." *Booth*, 201 F.3d at 345. Selectivity in what facts to rely upon is not problematic in and of itself, but instead is "part of a plan administrator's job." *Evans*, 514 F.3d at 326. For the reasons stated above, it was not unreasonable for Liberty to accord only limited to weight to the report of Harris, the FCE, and the statements of Everette and her family and friends and greater weight to the evaluations of the

medical records by Dr. Hryhorowych and Dr. Chemaly, particularly where Everette's treating physicians offered no contrary interpretation of the records.

The Court need not be convinced that the reports of Dr. Hryhorowych and Dr. Chemaly establish that Everette is not disabled. It is not the role of the Court to reverse the decision of the plan administrator "merely because it would have come to a different result in the first instance." *Id.* at 322, 325-26. Under the applicable standard of review, the Court concludes that, particularly with the lack of meaningful input from Everette's treating physicians, and the lack of an opinion from any other physician attesting to Everette's continuing disability, Liberty acted reasonably and did not abuse its discretion in denying continuing LTD benefits. The Court will therefore grant Liberty's Motion for Summary Judgment and deny Everette's Cross Motion.

## III. Production of Materials

Beyond the merits of the cross motions for summary judgment, Everette argues that she is entitled to statutory penalties under 29 U.S.C. § 1132(c) because of Liberty's alleged failure to produce its claim notes in a timely manner. ERISA regulations require employee benefit plans to "establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination." 29 C.F.R. § 2560.503-1(h)(1) (2017). The claim process constitutes a full and fair review of the adverse decision only if, among other things, the plan administrator provides the claimant with, "upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." *Id.* § 2560.503-1(h)(2)(iii); *see id.* § 2560.503-1(m)(8) (defining "relevant" documents, records, and information). Section 1132(c) provides that a plan administrator who fails "comply with a request for any information

which [it] is required by this subchapter to furnish . . . within 30 days after such request may in the court's discretion be personally liable to [a plan] participant or beneficiary" for up to $110 a day for each day from the date of the failure or refusal to comply. 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-1. Factors that may be considered by district courts in exercising their discretion include prejudice to the requesting party and "whether the administrator acted in bad faith." *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 659 (4th Cir. 1996).

Liberty contends that it is not liable to Everette for statutory penalties because, as stated in the affidavit of Liberty Litigation Manager Paula McGee, its routine practice in response to requests for claim information is to "include copies of all documents in its claim file, including claim notes." McGee Aff. ¶ 4, ECF No. 27-1. Liberty also contends that, even if it had inadvertently omitted production of the claim notes, there was no prejudice to Everette because the details of the notes mirror the other claim documents, which it had relied upon in making the disability benefit determination.

As an initial matter, Everette attempts to exclude the McGee affidavit because she was not disclosed as a witness under Federal Rules of Civil Procedure 26 and 37. Everette's argument is without merit. By offering the affidavit describing Liberty's routine business practice relating to document production, Liberty is not attempting to "sandbag" Everette with new evidence. Pl.'s Reply 6, ECF No. 28. The short affidavit was offered not to address the disability determination, but to assist in the evaluation of Everette's statutory penalty claim, which was described in detail for the first time in her Cross Motion. *See* Compl. ¶¶ 20-21, 24 (stating only that Defendants failed to "produce pertinent documentation requested" without specifying the documents at issue), ECF No. 1; Defs.' Mot. 9 n.2 (stating that the "exact

parameters of and legal support for the plaintiff's document claim are not clear" and suggesting that Everette should brief the issue in her Cross Motion), ECF No. 22-1.

Upon consideration of the McGee Affidavit and examination of the claim notes, the Court will not exercise its discretion to impose a statutory penalty. Even if the claim notes were not timely produced, Everette has not demonstrated persuasively that the content of the claim notes was so unique and crucial to her arguments to establish prejudice. There is also insufficient evidence of bad faith. Accordingly, Court denies Everette's Cross Motion as to the claim for statutory penalties under § 1132(c).

In her reply memorandum, Everette also requests statutory penalties for the failure to produce the August 2015 email correspondence between Liberty and GSK relating to the actual requirements of Everette's job. Everette, however, cites no case law in support of her position that Liberty was obligated to produce documents to Everette that were generated during the course of the appeal process. *See* 29 C.F.R. § 2560.503-1(h) (detailing the plan administrator's production requirements in the context of allowing for a "full and fair review" of "the adverse benefit determination"). To the contrary, courts have taken the position that "an insurer does not have to provide a claimant with [documents] generated during the claims review process until a final decision is issued." *Clarke v. Unum Life Ins. Co. of America*, 852 F. Supp. 2d 663, 677 (D. Md. 2012) (rejecting the plaintiff's argument that the plan administrator "was obligated to give her access to" documents generated during the appeal process "and an opportunity to rebut them before it made its final decision"); *accord Metzger v. UNUM Life Ins. Co. of America*, 476 F.2d 1161, 1166-67 (10th Cir. 2007) (stating that "[p]ermitting a claimant to receive and rebut . . . reports generated in the course of an administrative appeal . . . would set up an unnecessary cycle of submission, review, re-submission, and re-review," which would "prolong the appeal process"

and "unnecessarily increase cost of appeals"). The Court accordingly declines to impose any statutory penalties on Liberty for its failure to produce the August 2015 email correspondence to Everette.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED, and Everette's Cross Motion for Summary Judgment is DENIED. A separate Order shall issue.

Date: June 29, 2017

THEODORE D. CHUANG
United States District Judge